# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

# FRESNO DIVISION

| | |
|---|---|
| NATHANIEL ROYAL,<br><br>                                   Petitioner,<br><br>          vs.<br><br>S. KERNAN, Warden,<br><br>                                   Respondent. | CASE NO. 1:07cv0002 RTB (BLM)<br><br>**ORDER DENYING PETITION FOR**<br>**A WRIT OF HABEAS CORPUS** |

Nathaniel Royal ("Petitioner"), a state prisoner proceeding pro se and in forma pauperis, seeks a writ of habeas corpus under 28 U.S.C. § 2254. (Doc. No. 1.) Petitioner challenges his Kings County Superior Court conviction of conspiracy to possess a controlled substance in prison, as well as his sentence of twenty-five years to life in state prison, presenting eight grounds for relief.

Respondent has filed an Answer. (Doc. No. 11.) Respondent contends habeas relief is unavailable because claim one is procedurally barred, and the adjudication of all other claims in the Petition was neither contrary to, nor an unreasonable application of, clearly established federal law, nor was it based on an unreasonable determination of the facts. Petitioner has filed a Traverse. (Doc. No. 14.)

///

This matter has been reassigned to the Honorable Roger T. Benitez, United States District Judge for the Southern District of California. (Doc. No. 15.) For the reasons set forth below, the Court **DENIES** the Petition on the merits.

## I. TRIAL COURT PROCEEDINGS

The statement of facts in this case is taken from the unpublished Court of Appeal opinion in <u>People v. Royal</u>, slip op. No. F045166 (Cal.Ct.App., 5th Dist., January 11, 2005). (Lodgment No. 4.) The Court gives deference to state court findings of fact and presumes them to be correct. <u>See</u> <u>Sumner v. Mata</u>, 449 U.S. 539, 545-47 (1981). Because the factual history is length and detailed, it is recounted in its entirety.

> The events in question began in April of 2003, less than two years into an 18-year sentence Royal, known to his friends as "Rock" or "Rock Solid," was serving at Corcoran State Prison for armed robbery. The other principal participant in the alleged conspiracy was his girlfriend, Danyell Scott. Three more people also figured in the events: Royal's former girlfriend, Crystal Carbaugh, with whom he has a child, Savannah; a friend named Marlena Hall; and Marlena's boyfriend, Demon Hammer, whom Royal often identified as "Folks" or "my Folks," a street term meaning someone who is "like family." All four of these other people-Danyell, Crystal, Marlena, and Demon-lived at the time in or near Las Vegas, Nevada.

> There were four recorded telephone conversations, and eight intercepted letters, presented as evidence of the conspiracy. Generally speaking, they show Royal asking Danyell to pick up something-identified often as "girl" or "the girl"-from Demon or Crystal, and deliver it to him at the prison during an upcoming visit. Officer Ryan Pear, the prosecution's expert witness, testified that he believed the term "girl" referred to a controlled substance. Royal testified in his own defense that the term actually referred to his share of the still-unrecovered loot, or money from the sale of the loot, that he, Demon, and others had stolen during the jewelry store robbery that landed Royal in prison. The stolen jewelry was estimated to be worth $500,000.

> ### The In Limine Motion

> The defense moved in limine to exclude the testimony of Officer Pear as to his opinion that the term "girl" in Royal's phone calls and letters was a reference to drugs. Defense counsel argued: "... I think that that would be prejudicial and unfair for the People to utilize officers just to say that's their interpretation because ... there's no glossary of terms ... that are used in lieu of ... words like cocaine."

> The prosecutor submitted that Officer Pear would testify, based on his training and experience, that he believed "girl" referred to drugs. Asked what training and experience he had in particular with respect to the use of code words in prison to refer to drugs, Pear replied he had been assigned for the past two years to an "Investigative Services Unit" at Corcoran State Prison, one of whose purposes was to uncover narcotics trafficking in the prison; that he had received

- 2 -

classroom and on-the-job training on that subject; and that he had conducted numerous investigations and monitored hundreds of prisoners' telephone calls.

The court, based on this offer of proof, denied the in limine motion. It explained:

> "The question appears to be twofold. The first question is whether the subject matter of the proffered testimony is one in which expert testimony is appropriate. [¶] Normally anyone can have an opinion on ... what a particular word or phrase means in an oral or written communication and the jury is in as good a position as anyone else to interpret ordinary or even slang English.

> "In this case based on the offer of proof it is, as I understand it, that in the prison setting where inmates are talking about controlled substances that they normally use code words not otherwise associated with controlled substances. [¶] And further, that the proffered witness would be explaining the significance of the use of the word 'girl' in the context in which it's used in the communications to relate the use of the word ... to various practices involving using or smuggling controlled substances.

> "That appears to me to be a subject matter about which the normal citizen would not likely have much knowledge, training or education and that an appropriately qualified expert witness could enlighten the average citizen. Therefore [sic] is a proper subject of expert testimony.

> "Based on the offer of proof as to the officer's qualifications, he would seem to have sufficient expertise to be entitled to give an expert opinion in the meaning of the word 'girl' as used in these communications. Motion to exclude that testimony would be denied.

> "I would caution the People about having him opine about the meaning of other words or phrases whose meaning is a clear English meaning and don't think it's anything different than that because I don't think that would be a proper subject of expert testimony."

The court also ruled that Officer Pear could *not* rely as a basis for his opinion on statements made to him by Danyell, who reportedly told him in a postarrest interview that she had understood Royal's use of the word "girl" to mean drugs. That is, the officer was precluded from testifying about what Danyell had said to him in the interview.

Officer Pear was then the first witness called by the prosecution. He began his testimony by describing the training he had received in the identification of controlled substances, and his experience in investigating drug smuggling in prison. On voir dire by the defense however, he acknowledged that, in all the prisoners' calls and letters he had monitored, he had never encountered the word "girl" used to refer to illegal drugs. But he had, he said, seen the word in "perhaps three" affidavits submitted by other officers in support of their requests for search warrants.

///

- 3 -

The court ruled, over a defense objection Officer Pear did not qualify as an expert, that the prosecution could question him as an expert "in the field of narcotics trafficking in a prison setting."

## The Recorded Telephone Conversations

### The April 2d Conversations

The first two of the phone conversations took place, one shortly after the other, in the early evening of April 2, 2003. Royal called Danyell in each instance. Much of the first conversation was taken up with their quarrelling; Danyell was upset that Royal's collect calls from prison had run up her phone bill to almost $300.[FN1] And she says: "I'm mad at you because you ain't sent me no money from the last what I did." A few minutes into the call, Royal tells Danyell to "get that from my folks [Demon] for me," without saying what "that" is, to which Danyell replies "I don't want to deal with those people." (There was a dispute of some sort going on between Danyell and Demon.) Royal says he will tell "him" (Demon) to give "it" to Marlena, and asks Danyell to get "that" from Marlena. Danyell protests: "I don't want to be involved with that to be honest with you, you know I'm saying. All that I'm fittin to be off papers [parole] in two months." Royal gives Danyell "my Folks" phone number and tells her to call "and tell him I said give you that." "Tell him I don't want some Christmas pictures. Tell him I want my daughter. Tell him my daughter pictures. [¶] ... [¶] My Girl." Just before time runs out on the call, and the line is disconnected, Danyell finally agrees to call "him" (Demon) and take care of Royal's "business."

> FN1. Royal had been transferred only recently to Corcoran State Prison from a prison in Tehachapi, which presumably is where he was housed when these earlier phone charges were incurred. His recent arrival at Corcoran also probably explains why the first phone call recorded there seems to begin in the midst of on ongoing conversation with her about "that."

Asked about Danyell's statement to Royal that "I'm mad at you ...," Officer Pear testified, without an objection from the defense, that he thought it meant: "Miss Scott has introduced a controlled substance to, I believe, Inmate Royal previously in which case he didn't properly provide her with funds afterwards." His opinion, he said, was "[b]ased simply upon that statement. It's consistent."

Royal, on the other hand, would later testify that Danyell was upset because she had not received a cut of the loot from the jewelry store robbery. "That was for this case I'm in prison for is jewelry store robbery. None of the jewelry was obtained. All the jewelry got away. My Folks, Demon, have all my jewelry. [¶] Some of my jewelry got sold through my mother, and Danyell sold my mother. My mother kept all of the money so that she didn't give Danyell none of the money. I didn't get none of the money. So that's what she's speaking of. She didn't get no cut and that was it ."

The prosecutor then asked Officer Pear, again without an objection, what he thought it was that Danyell was to get from Folks. Before Pear could answer, the court, on its own initiative, ruled it was inadmissible. However, shortly afterward, the prosecutor asked Pear his opinion as to the meaning of "my girl." Officer Pear answered, without objection, that he believed it was "a code word for referencing a controlled substance." "My opinion," he continued, "is based upon the content of the telephone calls that I monitored as well as the suspicious

- 4 -

verbiage in the out-going correspondence from Nathaniel Royal." The defense then objected to Pear's use of the term "suspicious," and the court struck that word only.

Royal would later testify that "my girl," although it sometimes referred simply to his daughter or his girlfriend, was intended more generally to refer to the jewelry store loot. "I was trying to get the rest of any jewelry from Demon before he sell all the rest of my jewelry and put it in her [Danyell's] hands so she can sell it so I can get some of the money that I'm doing time for before all this jewelry is gone."

The second April 2d conversation resumed where the first one left off. Royal tells Danyell again that "the main thing just get in touch with my folks and tell him I want my girl, you know I'm saying, cause I ain't seen her in a while." Danyell agrees.

Officer Pear was again permitted to testify, without objection, that he believed the term "girl" referred to a controlled substance.

## The April 11th Conversations

The third and fourth phone conversations, this time between Royal and Crystal, took place nine days later on April 11th, again in quick succession. In the third one, after some talk about their daughter Savannah, Royal asks Crystal to call Danyell to find out if she (Danyell) is coming to visit him. Crystal calls and establishes a three-way telephone connection with Danyell. Danyell asks Royal: "Are you gonna send me that or you did already?" Royal replies: "I already told my people to send that." Officer Pear testified, without objection, that he believed the word "that" referred to a controlled substance.

Royal calls Crystal back and asks her to create a three-way connection with Folks. Folks tells Royal: "But I got that ready for you so whenever you want run, I run to other girl [Crystal] man. I don't really feel like dealing with her [Danyell]." Royal then tells Crystal to "[j]ust get that from him [Folks] for me and give it to Danyell, could you do that?" She agrees. Folks promises to take care of it Sunday. (The call was made on a Friday.) "You talkin about girl right?" Royal asks. "Yeah," Folks replies, "have her here." Folks hangs up, and Royal tells Crystal to call Danyell and "tell her you gonna have something for her Sunday," and "I said get her ass up here next week." Once more, Officer Pear was permitted to testify, without objection, that he believed the word "that" as used by Folks and Royal referred to a controlled substance.

### The Intercepted Letters

The following Sunday, April 13th, Royal wrote four letters-to Danyell, Crystal, Folks, and Marlena-all of which were intercepted and copied by Officer Pear before he sent them on to their intended recipients. Pear read each of the letters, in their entirety, to the jury. The following are excerpts, based on the letters themselves rather than on the transcription of Pear's reading of them.

## Royal's April 13th letter to Danyell

"... Listen Crystal got my girl from Demon, & it's waiting for you to pick up.... Now I need my girl all of it & just a little of that girl

stuff, put it all in one rub [condom]. Baby, about this long. [small vertical line about a quarter inch in length]"

"... I will give you the money I been saving here that I been hustling with that girl. ... The reason you didn't get no cut last time Because I been saving everything so when I come home we could have a few dollars to do the things we need to do, like going out of town to get our stuff & money...." [FN2]

> FN2. Royal told Danyell several times in his letters and phone calls that he would be getting out of prison in a few months, and she was to use the money he would give her to rent an apartment for the two of them. In fact, Royal had been sentenced in September of 2001, less than two years earlier, to a term of 18 years in prison for the two jewelry store robberies (with a gun use enhancement) he had committed with Demon and others in Barstow. He testified he lied to Danyell "because normally if a woman find out the timeframe I have left she would leave, so I just wanted to see her as much as I possibly could see her."

"... Now I told you to been come get this money from this girl that I have here with me, it's all 100 dollars bills. I'll slip it to you in a toil paper. It's just [$]1400...."

"... You know I don't asks you for shit if I don't need it. I need my girl so I can keep making a few dollars for us. See, I think about both of us not just myself.... Bae [Babe] listen Crystal have my girl & some other shit. Go get it now from Crystal. Baby I need all that girl & a little of that other thing. And just put up the rest of it till I come home. You know how to handle that girl, & thank you for keeping it real...."

Officer Pear testified, without objection, that he believed Royal's use of the term "girl" referred to a controlled substance "he wished for Danyell to introduce into the institution for him," and that "hustling the girl" meant Royal was dealing drugs in the prison.

At the next recess, outside the presence of the jury, the court, on its own initiative, advised counsel as follows: "An expert witness such as Mr. Pear is certainly qualified to give opinions as to the procedures and devices that are available to prison inmates to smuggle contraband.... [¶] He's qualified to give expert opinion as to how contraband is referred to commonly by inmates. He's not qualified-it's not an appropriate area of expert testimony for him to opine what the defendant meant by saying something. [¶] He's not a mind-reader and he's not in any better position than the jury is to say what Mr. Royal meant."

<u>Royal's April 13th letter to Crystal:</u>

"... Did you call my Folk & get that for me. If not call him & have him drop it off to you. Look I need you to only give her only all the white & a handful of the other thing. And put up the rest of the green for me, till I call for it. You could have some of the green if you want to. But don't mess with that white it's business. But

- 6 -

do one more thing for me put all the white and the handful of green in a rubber for me, & tie it tight. Call her to come get it ok."

Officer Pear testified, without objection, that he believed the words "that" and "it" in the letter referred to a controlled substance. The court sustained an objection to Pear's testimony the word "white" referred to a narcotic "probably."

Royal would later testify that "white" referred to diamonds and "green" referred to money, and that he wanted Crystal to put all the jewelry ("the girl")-diamonds, Rolex watches, and "other jewelries"-in a condom to prevent them from getting scratched. "I've been robbing jewelry stores basically since I was young. And that's my method to keep it from getting scratched, and that's what works for me so it don't get scratched." [FN3]

> FN3. In addition to the two armed robberies for which he was then in prison, Royal acknowledged having been previously convicted of two counts of armed robbery in Louisiana in 1991, and one count of attempted armed robbery with the use of a deadly weapon in Nevada in 1994.

Royal's April 13th letter to "Allen Folks":

> "... Whats up Bro? [¶] Sorry about what the hoe [Danyell] did. You should have put hands on the hoe. After this last run, I am finish with the hoe. So do whatever you need to.... Just wait till I get my work from the hoe. Did you give that to Crystal yet? ... Let Crystal know how much girl so I'll know what to look for from old girl [Danyell]."

Officer Pear testified, without objection, that making a "run" is a reference to "introducing a controlled substance into the institution, making a controlled substance deal." The court sustained an objection to Pear's testimony the word "girl" refers to a controlled substance. The prosecutor thereafter made no further inquiries of Officer Pear regarding the meaning of the words in Royal's letters.

Royal's April 13th letter to Marlena:

> "... I never stop hustling. I hustle here & got more money then Danyell have to here name. Thats why I need you to rent a car & drive with Danyell up here, so I could give here this money. We not allowed to have cash, but we still get it, & serve like they doing on the street. I need to get her this money before they fine it. So she could get the apartment [where Royal planned to stay when released from prison].... I got to slid here the money when the officers isn't looking."

Officer Pear intercepted four more letters written by Royal during the next two weeks. He read portions of each one to the jury.

Royal's April 17th letter to Danyell:

> "... Baby whats up am I going to see you this weekend the 26 or next weekend the 3 of May. Look all bull shit aside, you need to ... handle my business all that girl. I am depending on you; I have to stay at my money.... Baby listen Marleena can't think, she will

do whatever you tell her.... Tell the girl to get the car & come take a ride with you up here.... Baby get that from Crystal, I really need that.... [¶] ... [¶] ... And take care of that business ok."

<u>Royal's April 17th letter to "Demon Hammon":</u>

" 'Folk, whats up? Dogg I need you to drop that off to Crystal A.S.A.P.... Ok Dogg, I know you are working & busy. But handle that before this coming weekend the 26, it got to be before that. I hope you already went threw there.... Get at me & Crystal A.S.A.P. homie. This can't wait till tomorrow. Make that run for me now...."

<u>Royal's April 23rd letter to Danyell:</u>

"... I need to see you as A.S.A.P.... & I need that girl so get it from Crystal are call my Folks & tell them you are calling for your man to get that girl. Please put y'all differents aside & do this for me ok. But Crystal should have it ok. You need to be up her know later then the 10 of May ok. I don't want to here know excuses about coming to see me or about my business girl ok."

"... Baby, be cool. I need to see you & I need that girl. Thats what you need to handle what I asks you...."

"... Look you need to get my girl to me so I could stay at this money for us.... Focus on what you need to handle please. If I tell you its cool it is what I say it is ok, Boo. Baby no later than the 10th of May ok Baby? ... get my work from Crystal or make Marlena call & get it. She can't think you make her do whatever you need her to do...."

<u>Royal's April 27th letter to Danyell:</u>

"... I don't want to hear know shit. I been getting at you a lot to get my girl from Crystal or from my Folks .... this is business so put the bull shit a side & call & get her if you don't have it ok. And don't for get to rubber it & tape it up to make her firm ok, that's important. All the girl & green a little in one rubber, handle that, thank you. I know I could depend on you...."

"... This lock down is suppost to be for today Sunday. Just call to be safe ok.... Call & make sure I could have <u>contact</u> <u>visit</u> before coming....[¶] Baby don't when I tell you something I handle it? Put the girl dog in the house before you leave. Let her out the house, as you wait for Rock to come home...."

"... Call up here Friday Are the day you get this letter & make sure Blacks are having visits.... Baby this is important because they making blacks visit behind a glass.... Look, if they tell you we are visiting behind the glass don't come see me. Look don't come see me if we got to visit behind the glass...."

Sometime after she received this last letter apparently, but before her visit to the prison on May 11th, Danyell wrote a letter to Royal in which she said: " 'I got your girl so please stop telling me the same thing over and over again. I know

what I have to do with her.... I'm doing my best to come see you on the 3rd, okay? ... [¶] Chill your ass out and stop ordering me, okay?'"

### Danyell Comes to Visit on May 11, 2003

Danyell Scott arrived at Corcoran State Prison at about 9:30 a.m. on Sunday, May 11, 2003, and asked to visit with Royal. She was required to undergo an "unclothed body search," which yielded a small plastic package of white powder she had concealed in her vagina. The powder was later determined to be 9.07 grams of "fairly pure" cocaine. This was described as "a lot of substance," capable of producing 900 standard 10-milligram doses, and said to be worth about $2,700 in the prison. Danyell was arrested, and Royal was moved from the general prison population into an administrative segregation cell. A search of his person (not including body cavities) and belongings failed to uncover either money or drugs.

Royal would later testify he had not been aware Danyell was coming to see him on that day, and he had not asked her to smuggle drugs to him. The defense pointed out that Danyell had a previous conviction for drug trafficking in Louisiana, and it suggested she had actually intended to smuggle the cocaine to her mother, who was in a federal prison in California somewhere.

### The Information

On May 13, 2003, the District Attorney of Kings County filed a criminal complaint alleging five counts against Danyell individually, and five conspiracy counts against her and Royal together, for possession, possession for sale, and for transportation of cocaine. Both were held to answer, and an eight-count information was filed against them later the same month. A determination was later made to try the two defendants separately, and an amended information was filed against Royal alone. It alleged Royal had conspired with others to commit one or more of the following crimes: (1) unauthorized possession of a controlled substance in a state prison (Pen.Code, § 4573.6); and/or (2) possession of a controlled substance for sale (Health & Saf.Code, § 11351); and/or (3) furnishing a controlled substance to a person in state prison (Pen.Code, § 4573.9).

The information alleged five overt acts in furtherance of the conspiracy: (1) Royal arranged for controlled substances to be purchased or obtained; (2) he instructed Danyell from whom to obtain them; (3) he instructed Danyell how to package them; (4) Danyell entered Corcoran State Prison with cocaine secreted in her vagina; and (5) she was in possession of 9 grams of cocaine.

The information also alleged that Royal had suffered two prior violent or serious felony convictions-i.e., two counts of second degree robbery in 1991-for purposes of the three strikes law.

### Royal's September 6, 2003 Letter

Officer Pear continued to monitor Royal's mail from prison pending trial of the charges against him. On September 6, 2003, Royal sent a letter to Crystal (addressed to their daughter Savannah). The letter, as read to the jury by Pear, stated in part:

- 9 -

"Look, my lawyer investigator will call you soon to get a statement from you, and he will get one from my Folks and Marlena, too. So just let him know like you told me on the phone, he never came and call you and told you he would take care of sending me my money that he was going to drop off to you and send me or give it to Danyell. You don't know nothing about no code words or what they mean, but in Vegas, girl is known to be called money because girls make more money in Vegas so people just call girl money.

"You don't know nothing about no drugs, and you don't have nothing to do with drugs or people that deal drugs. All you know my Folks was dropping some money off to my daughter for her skates and for me. That's it. Nothing else. You are not in this so don't worry. I need that statement from you so talk to him and I am calling you, my Folks and Marlena to testify at my trial if I go to trial...."

**The Verdict**

Following a four-day trial in January of 2004, the jury returned a verdict finding Royal guilty of conspiring to possess a controlled substance in state prison (Pen.Code, § 4573.6), and finding that he committed the offense while confined in state prison. (Pen.Code, § 1170.1, subd. (c) [when consecutive sentence imposed, the term of imprisonment runs from time person would otherwise have been released from prison].)

Royal had previously admitted the two strike allegations.

The court sentenced Royal, pursuant to the three strikes law, to a term of 25 years to life in state prison, consecutive to the term he was already serving.

(Lodgment No. 4, <u>People v. Royal</u>, No. F045166, slip op. at 2-14.)

**II. STATE COURT PROCEEDINGS**

Petitioner appealed his conviction to the California Court of Appeal, Fifth Appellate District, case number F045166, raising two grounds for relief. Appellant's opening brief was filed on August 6, 2004, Respondent's Brief was filed on September 1, 2004, and Appellant's Reply Brief was filed on September 21, 2004. The Court affirmed Petitioner's conviction and sentence in an unpublished opinion filed on January 11, 2005. (Lodgment No. 4.)

On July 27, 2005, Petitioner filed a petition for writ of habeas corpus in the Kings County Superior Court, raising four grounds for relief. (Lodgment No. 5, Case No. 05W 0137-A.) On November 14, 2005, the Kings County District Attorney filed an informal response. (Lodgment No. 6.) The Superior Court denied the petition on December 13, 2005. (Lodgment No. 7.)

07cv0002

On January 18, 2006, Petitioner filed a petition for a writ of habeas corpus in the California Supreme Court, raising nine grounds for relief. (Lodgment No. 8, Case No. S140768.) The petition was summarily denied on November 29, 2006. (Lodgment No. 9.)

### III. PETITIONER'S CLAIMS

Petitioner claims that his rights to due process, effective assistance of counsel, and a fair trial under the Fifth, Sixth and Fourteenth Amendments to the United States Constitution, were violated by:

(1) The trial court's error in qualifying Officer Pear as an expert, and allowing him to testify on the use of code words in prison communications to refer to controlled substances as it related to Petitioner's case;

(2) The trial court's error in failing to instruct the jury, *sua sponte*, pursuant to CALJIC 6.24, on evaluating co-conspirator hearsay statements;

(3) The prosecutor's prejudicial misconduct in questioning Officer Pear on inadmissible matters;

(4) Trial counsel's failure to move for a mistrial due to prosecutorial misconduct;

(5) Trial counsel's failure to object to Officer Pear's testimony on the meaning of certain words in Petitioner's phone calls and letters;

(6) Trial counsel's failure to exercise peremptory challenges against prospective jurors who were acquainted with or related to correctional officers at the prison where Petitioner was housed, and where the charged crime occurred;

(7) Trial counsel's failure to investigate and provide statistical evidence in support of Petitioner's objection to the composition of the Kings County jury venire due to under-representation of African-Americans; and

(8) Trial counsel's failure to move for a change of venue from Kings County due to its high population of correctional officers and other prison personnel.

///
///
///

07cv0002

# IV. SCOPE OF REVIEW

Title 28, United States Code, § 2254(a), sets forth the following scope of review for federal habeas corpus claims:

> The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in <u>violation of the Constitution or laws or treaties of the United States</u>.

28 U.S.C.A. § 2254(a) (West 2006) (emphasis added).

As discussed in detail below, the claims presented in the federal Petition were adjudicated on their merits in the state courts. As amended, 28 U.S.C. § 2254(d) now reads:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C.A. § 2254(d)(1)-(2) (West 2006).

A decision is "contrary to" clearly established law if it fails to apply the correct controlling authority, or if it applied the controlling authority to a case involving facts materially indistinguishable from those in a controlling case, but nonetheless reaches a different result. <u>See</u> <u>Williams v. Taylor</u>, 529 U.S. 362, 413 (2000). A decision involves an "unreasonable application" of federal law if "the state court identifies the correct governing legal principle . . . but unreasonably applies that principle to the facts of the prisoner's case." <u>Id.</u>; <u>Bruce v. Terhune</u>, 376 F.3d 950, 953 (9th Cir. 2004).

Even when the federal court undertakes an independent review of the record in the absence of a reasoned state court decision, the federal court must "still defer to the state court's ultimate decision." <u>Pirtle v. Morgan</u>, 313 F.3d 1160, 1167 (9th Cir. 2002). If the state court decision does not furnish any analytical foundation, the review must focus on Supreme Court cases to determine "whether the state court's resolution of the case constituted an unreasonable

application of clearly established federal law." <u>Greene v. Lambert</u>, 288 F.3d 1081, 1089 (9th Cir. 2001). Federal courts also look to Ninth Circuit law for persuasive authority in applying Supreme Court law and to determine whether a particular state court decision is an "unreasonable application" of Supreme Court precedent. <u>Davis v. Woodford</u>, 384 F.3d 628, 638 (9th Cir. 2004).

## V. DISCUSSION

For the reasons stated below, Petitioner does not warrant habeas relief on any of the claims in the Petition.

### A.    Claim 1

Petitioner alleges that the trial court erred in qualifying Officer Ryan Pear as an expert in the use of code words in prison to refer to controlled substances, and allowing him to "make interpretations of words contained in the letters and phone calls of possible drug trafficking in an institutional setting," violating Petitioner's right to a fair trial under the Fifth and Fourteenth Amendments. (Petition at 6.)

Petitioner raised this claim in his habeas petition filed in the California Supreme Court, which denied the claim without comment or citation to authority. (Lodgment No. 9.) Thus, the Court must "look through" that opinion to the state appellate court's reasoned resolution of the claim. <u>Ylst v. Nunnemaker</u>, 501 U.S. 797, 803 (1991) ("The essence of unexplained orders is that they say nothing. We think that a presumption which gives them *no* effect- which simply "looks through" them to the last reasoned decision- most nearly reflects the role they are ordinarily intended to play.") (italics in original).

The Court of Appeal held as follows:

Royal asserts: "The trial court erred in finding Officer Pear qualified as an expert on the meaning of various words stated in [Royal's] telephone calls and letters and in permitting him to state his opinion as to the meaning of those words." It does not appear to us, however, that the court actually did either of these things.

The trial court ruled in limine that Officer Pear "would seem to have sufficient expertise to be entitled to give an expert opinion in the meaning of the word 'girl' as used in these communications." This, by its terms, was only a provisional or interim ruling based on the prosecutor's representations as to what the evidence would be, and on Pear's general statements about his training and experience. (*See*, e.g., *People v. Morris* (1991) 53 Cal.3d 152, 187-191; 3

- 13 -

Witkin, Cal. Evidence (4th ed. 2000) Presentation At Trial, §§ 368-370, pp. 455-459.)

Soon afterward, when Officer Pear was called to testify and acknowledged, among other things, that he had never encountered the word "girl" used by an inmate to refer to illegal drugs, the court ruled only that he qualified as an expert "in the field of narcotics trafficking in a prison setting." This, plainly, was not the same as a determination that Pear was an expert "on the meaning of various words stated in [Royal's] telephone calls and letters." Indeed, after Pear testified several different times, without an objection from the defense, about what he thought certain of Royal's words meant, the court, on its own initiative, advised the parties outside the presence of the jurors:

"... An expert witness such as Mr. Pear is certainly qualified to give opinions as to the procedures and devices that are available to prison inmates to smuggle contraband.... [¶] He's qualified to give expert opinion as to how contraband is referred to commonly by inmates. He's not qualified-it's not an appropriate area of expert testimony for him to opine what the defendant meant by saying something. [¶] He's not a mind-reader and he's not in any better position than the jury is to say what Mr. Royal meant."

Nevertheless, even though it was not Pear's experience that inmates commonly referred to contraband as "girl," the defense twice more failed to object to Pear's testimony about what Royal meant when he used certain words. And when the defense finally did object, the court sustained the objection.

In short, we conclude Royal waived his objection to Officer Pear's testimony by failing to properly raise it before the trial court. (*People v. Morris*, *supra*, 53 Cal.3d at pp. 189-190.) Moreover, while we agree with the trial court that the testimony was not admissible, we conclude Royal suffered no prejudice as a result of his counsel's inaction.

Royal's letters and phone calls, standing alone, establish only that he arranged for Danyell to bring him something in prison, Officer Pear's opinion notwithstanding. This fact, however, together with Danyell's appearance at the prison with 9 grams of cocaine secreted in her vagina, and Royal's subsequent letter to Crystal instructing her to say that "girl" meant money rather than drugs, leaves no real doubt about what the something was to which Royal was referring.

(Lodgment No. 4, <u>People v. Royal</u>, No. F045166, slip op. at 14-15.)

Respondent contends that this claim is procedurally defaulted because trial counsel repeatedly failed to object to Officer Pear's testimony on the meaning of terms such as "girl," "green," and "white" in Petitioner's letters and phone calls, and therefore waived the claim under California's contemporaneous objection rule. When a state court's rejection of a federal claim involves a violation of a state procedural rule which is adequate to support the judgment and independent of federal law, a habeas petitioner has procedurally defaulted his claim. <u>Coleman v. Thompson</u>, 501 U.S. 722, 729-30 (1991). A state procedural rule is adequate it

- 14 -

has been "firmly established and regularly followed" by the state court. <u>Ford v. Georgia</u>, 498 U.S. 411, 424 (1991). The procedural rule is independent if it is not "interwoven with the federal law." <u>Michigan v. Long</u>, 463 U.S. 1032, 1040-41 (1983).

The Ninth Circuit has held that because procedural default is an affirmative defense, Respondent bears the burden of pleading and ultimately proving the existence of an adequate and independent procedural bar, with Petitioner bearing an interim burden of placing the adequacy of the defense at issue. <u>See</u> <u>Bennett v. Mueller</u>, 322 F.3d 573, 585 (9th Cir. 2003). Here, Respondent has met his initial burden under <u>Bennett</u> by pleading that this claim is procedurally defaulted under California's contemporaneous objection rule, which the Ninth Circuit has held is independent and adequate. <u>See</u> <u>Rich v. Calderon</u>, 187 F.3d 1064, 1069-70 (9th Cir. 1999).

The burden of placing the adequacy of the procedural bar in issue therefore shifts to the Petitioner and "[t]his must be done, at a minimum, by specific allegations by the petitioner as to the adequacy of the state procedure. The scope of the state's burden of proof thereafter will be measured by the specific claims of inadequacy put forth by the petitioner." <u>Bennett</u>, 322 F.3d at 584-85. Petitioner offers no challenge to the adequacy of the procedural bar, and thus fails to satisfy his interim burden under <u>Bennett</u>. The Court must therefore conclude the procedural default in question rests on an adequate and independent state procedural ground, and "federal habeas review is barred unless the prisoner can demonstrate cause for the procedural default and actual prejudice, or demonstrate that the failure to consider the claims will result in a fundamental miscarriage of justice." <u>Noltie v. Peterson</u>, 9 F.3d 802, 804-805 (9th Cir. 1993); <u>Coleman</u>, 501 U.S. at 750; <u>Park v. California</u>, 202 F.3d 1146, 1150 (9th Cir. 2000).

## 1. <u>Cause</u>

A showing of cause requires Petitioner to demonstrate that "some objective factor external to the defense" obstructed his efforts to comply with the procedural rule, such as interference by state officials or constitutionally ineffective counsel. <u>McClesky v. Zant</u>, 499 U.S. 467, 493-494 (1991). The Supreme Court states:

Although we have not identified with precision exactly what constitutes "cause" to excuse a procedural default, we have acknowledged that in certain circumstances counsel's ineffectiveness in failing properly to preserve the claim for review in state court will suffice. [*Murray v. Carrier*, 477 U.S. 478, 488-89 (1986).] Not just any deficiency in counsel's performance will do, however; the assistance must have been so ineffective as to violate the Federal Constitution. *Ibid.* In other words, ineffective assistance adequate to establish cause for the procedural default of some *other* constitutional claim is *itself* an independent constitutional claim. And we held in *Carrier* that the principles of comity and federalism that underlie our longstanding exhaustion doctrine--then as now codified in the federal habeas statute, see 28 U.S.C. §§ 2254(b),(c)--require *that* constitutional claim, like others, to be first raised in the state court. "(A) claim of ineffective assistance," we said, generally must "be presented to the state courts as an independent claim before it may be used to establish cause for a procedural default." *Carrier*, *supra*, at 489.

Edwards v. Carpenter, 529 U.S. 446, 451-52 (2000).

Petitioner directs the Court to Claim Five of his petition, in which he alleges he was "denied effective assistance of counsel during trial when he [counsel] repeatedly failed to object to Officer Pear's testimony." (Traverse at 3.) In order to satisfy the cause prong, the ineffective assistance of counsel claim must have been itself raised as an independent claim in state court. In the instant case, Claim 5 was raised in a state habeas petition filed in the California Supreme Court, and was denied in an order that read in full: "Petition for writ of habeas corpus is DENIED." (Lodgment No. 9.)

However, as discussed below, even if Petitioner's assertion of ineffective assistance of counsel could constitute sufficient cause for the procedural default, Petitioner is unable to demonstrate requisite prejudice arising from the default.

## 2. **Prejudice**

The Supreme Court has held that if a petitioner is able to demonstrate cause for his default, he must also show actual prejudice resulted from the errors he alleges. Zant, 499 U.S. at 494. To establish the requisite prejudice to overcome a procedural default, a petitioner must establish "not merely that the errors at his trial created a *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." United States v. Frady, 456 U.S. 152, 170 (1982) (emphasis in original). The Ninth Circuit has held that "[p]rejudice is actual harm resulting from the alleged error." Vickers v. Stewart, 144 F.3d 613, 617 (9th Cir. 1998).

1     In this instance, Petitioner has failed to establish prejudice arising from the procedural

2     default because Claim 1 is without merit. <u>Coleman</u>, 501 U.S. at 750.  On several occasions

3     during direct examination, Officer Pear rendered his opinion on the meaning of words such as

4     "girl" in Petitioner's communications.  On cross-examination, Pear conceded that because he

5     did not actually know the contents of Petitioner's mind, he looked at the context of the

6     communications in forming his conclusion that Petitioner's "code words" referred to drugs.

7     (Lodgment No. 11 at 177.)  However, apart from Pear's testimony, the prosecution presented

8     substantial evidence in support of the charges. The prosecution introduced the letters between

9     Petitioner, Scott and others repeatedly requesting that Scott bring him something ("girl") on

10    her next visit to prison.  The jury was also apprised of letters Petitioner sent Scott in which he

11    repeatedly requested Scott make sure her prison visit was a "contact visit."  Additionally, the

12    recorded phone calls between Petitioner and Scott demonstrate that on several other occasions

13    Petitioner reiterated his request that Scott to bring him "that" or "girl" on her next visit.  Prison

14    records demonstrate that Scott arrived at Corcoran for a visit with Petitioner with cocaine

15    secreted on her person.  The jury was also presented with a letter Petitioner sent Scott four

16    months after the charges were filed, in which the Petitioner advised her that his attorney would

17    contact her, and stating that, "in Vegas, girl is known to be called money because girls make

18    more money in Vegas. . .You don't know nothing about no drugs."

19        As detailed above, there was sufficient evidence to support Petitioner's conviction aside

20    from Officer Pear's testimony on the possible meaning of the words "girl," among others, in

21    Petitioner's communications.  The plain meaning of Petitioner's letters and phone calls

22    requesting Scott bring him "girl" in her next visit, coupled with Scott's arrival at the prison

23    with drugs on her person, and Petitioner's subsequent letter advising her of the meaning of the

24    word "girl," is sufficient evidence to overcome any potential harm resulting from Officer

25    Pear's testimony.  Petitioner is unable to demonstrate prejudice sufficient to overcome the

26    procedural default because the claim is without merit.

27    ///

28    ///

The only remaining exception to an otherwise procedurally barred claim requires a petitioner to "demonstrate that the failure to consider the claims will result in a fundamental miscarriage of justice." Noltie, 9 F.3d at 804-805; Coleman, 501 U.S. at 750. The Supreme Court has strictly limited this exception to habeas petitioners who can show that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." Murray v. Carrier, 477 U.S. 478, 488 (1986). To avail himself of this exception, Petitioner must demonstrate factual innocence, that "it is more likely than not that no reasonable juror would have convicted him," but for the error. Schlup v. Delo, 513 U.S. 298, 327 (1995).

Petitioner fails to satisfy this standard. As set forth above, there is no reasonable likelihood that the jury's decision was materially affected by the introduction of Officer Pear's interpretation of the "code words" used in Petitioner's letters and phone calls. The plain meaning of those words was clear, especially when coupled with Scott's actions and Petitioner's September 6, 2003 letter asserting that Scott "don't know nothing about no code words" and attempting to explain the *real* meaning of the word "girl" in his communications. In light of this evidence against Petitioner, the inclusion of the contested portions of Officer Pear's testimony does not lead this Court to conclude in this case that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." Schlup, 513 U.S. at 327; Wood v. Hall, 130 F.3d 373, 379 (9th Cir. 1997). Petitioner fails to demonstrate that the Court's failure to consider this claim on the merits will result in a fundamental miscarriage of justice. Coleman, 501 U.S. at 750. Claim 1 is procedurally defaulted and Petitioner has not demonstrated cause or prejudice to overcome the default. Habeas relief is therefore unavailable as to Claim 1.

**B.     Claim 2**

Petitioner asserts that the trial court erred in failing to *sua sponte* instruct the jury on the method by which to evaluate co-conspirator hearsay statements pursuant to CALJIC 6.24, which constituted "prejudicial error and requires federal habeas relief." (Pet. at 7.) Respondent maintains that this Court does not have jurisdiction over this claim, as the state

court's decision was based on an interpretation and application of state law. (Ans. at 20.)

In the federal petition, Petitioner does not specifically cite the United States Constitution or explicitly identify a federal violation. However, in his state habeas petition, Petitioner asserted that the trial court's failure to instruct the jury pursuant to CALJIC 6.24 "violated petitioner's right to a fair trial under the Fifth and Fourteenth Amendment [sic] to the United States Constitution." (Lodgment No. 8 at 6.) Therefore, the federal aspect of Petitioner's claim is exhausted. Moreover, the Court is required to construe this petition liberally. See Resnick v. Hayes, 213 F.3d 443, 447 (9th Cir. 2000) ("[I]n general, courts must construe *pro se* pleadings liberally."). Thus, the Court will construe Claim 2 as presenting a claim identical to the claim presented in the state habeas petition, which alleged a violation of Petitioner's federal constitutional rights based on the trial court's failure to *sua sponte* instruct the jury pursuant to CALJIC 6.24.

Petitioner presented this claim to the California Supreme Court on state habeas review, which denied the claim without comment or citation of authority. (Lodgment No. 9.) Therefore, the Court must "look through" that opinion to the last reasoned opinion. See Ylst, 501 U.S. at 803. The California Court of Appeal denied this claim on appeal, ruling as follows:

> On the premise the statements of his alleged coconspirators-Danyell, Crystal, Marlena, and Demon-were admitted under the coconspirator exception to the hearsay rule (Evid.Code, § 1223),[FN4] Royal maintains the trial court had a *sua sponte* duty to give the jury an instruction pursuant to CALJIC No. 6.24, which provides:
>
> FN4. Evidence Code section 1223 states:
>
> "Evidence of a statement offered against a party is not made inadmissible by the hearsay rule if: [¶] (a) The statement was made by the declarant while participating in a conspiracy to commit a crime or civil wrong and in furtherance of the objective of that conspiracy; [¶] (b) The statement was made prior to or during the time that the party was participating in that conspiracy; and [¶] (c) The evidence is offered either after admission of evidence sufficient to sustain a finding of the facts specified in subdivisions (a) and (b) or, in the court's discretion as to the order of proof, subject to the admission of such evidence."
> "Evidence of a statement made by one alleged conspirator other than at this trial shall not be considered by you as against another alleged conspirator unless you determine by a preponderance of the evidence:

- 19 -

"1. That from other independent evidence that at the time the statement was made a conspiracy to commit a crime existed;

"2. That the statement was made while the person making the statement was participating in the conspiracy and the person against whom it was offered was participating in the conspiracy before or during that time; and

"3. That the statement was made in furtherance of the objective of the conspiracy.

"The word 'statement' used in this instruction includes any oral or written verbal expression or the nonverbal conduct of a person intended by that person as a substitute for oral or written verbal expression."

When the admission of evidence is dependent upon the existence of preliminary facts, the procedure for establishing those facts is set out in Evidence Code sections 400 through 405. (*People v. Herrera* (2000) 83 Cal.App.4th 46, 60 (*Herrera*).) Evidence Code section 403, subdivision (c) provides in part: "If the court admits the proffered evidence under this section, the court: [¶] (1) May, and on request shall, instruct the jury to determine whether the preliminary fact exists and to disregard the proffered evidence unless the jury finds that the preliminary fact does exist." (Italics added.) CALJIC No. 6.24 is such an instruction. Here, the defense made no request for the instruction, nor did it put the prosecution to its proof of the preliminary facts necessary for admission of coconspirator hearsay. Nevertheless, even assuming the court had a *sua sponte* duty to so instruct, Royal suffered no prejudice as a result of his counsel's failure to request the instruction.

"The gist of the offense [of conspiracy] is the unlawful agreement between the conspirators to commit an offense prohibited by statute, accompanied by an overt act in pursuance thereof." (*People v. Curtis* (1951) 106 Cal.App.2d 321, 325; *Herrera*, *supra*, 83 Cal.App.4th at p. 64.)

Before the hearsay statements of a coconspirator may be admitted, the existence of the conspiracy must be shown by proof independent of the statements. (Evid.Code, § 1223.) But, all that is required is prima facie evidence of the conspiracy. (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1134.) "Evidence is sufficient to prove a conspiracy to commit a crime 'if it supports an inference that the parties positively or tacitly came to a mutual understanding to commit a crime. [Citation.] The existence of a conspiracy may be inferred from the conduct, relationship, interests, and activities of the alleged conspirators before and during the alleged conspiracy. [Citations.]' [Citation.]" (*Id.* at p. 1135.)

The acts and declarations constituting the agreement itself are not hearsay and so are admissible to show the prima facie existence of the conspiracy. (*People v. Jourdain* (1980) 111 Cal .App.3d 396, 405; *People v. Curtis*, *supra*, 106 Cal.App.2d at p. 326.)

"'Now it must be apparent that when an agreement is not in writing parol evidence is admissible to prove its contents. And, when the agreement is in parol, evidence of the conversations of the parties tending to disclose the agreement made is evidence of the very fact to be proved and hence is evidence of the res gestae. Hence, when the conspiracy charged in the indictment is an "agreement" to do or not to do a certain act evidence of the conversations and

acts of the conspirators which constitute the agreement is admissible to prove the agreement....'" (*People v. Curtis*, *supra*, 106 Cal.App.2d at p. 326.)

Thus, the statements of Royal, Danyell, Crystal, and Demon to one another in the letters and telephone calls, inasmuch as they were evidence of their agreement to smuggle drugs into prison, were admissible to prove the conspiracy irrespective of section 1223 of the Evidence Code. This being so, for the reasons we have already discussed, there is no reasonable possibility the jury would have reached a verdict more favorable to Royal if a CALJIC No. 6.24 instruction had been given.

(Lodgment No. 4, <u>People v. Royal</u>, No. F045166, slip op. at 15-18.)

The Supreme Court has held that a federal court may not generally grant federal habeas relief based on errors of state law. <u>See</u> <u>Estelle v. McGuire</u>, 502 U.S. 62 (1991) ("[I]t is not the province of a federal habeas court to reexamine state court determinations on state law questions."). To merit federal habeas relief based on a state trial error, a petitioner must demonstrate that the error "so infected the entire trial that the resulting conviction violates due process." <u>Henderson v. Kibbe</u>, 431 U.S. 145, 154 (1977), quoting <u>Cupp v. Naughten</u>, 414 U.S. 141, 147 (1973). Additionally, when the trial court's failure to give an instruction is at issue, the burden on a petitioner is "especially heavy." <u>Kibbe</u>, 431 U.S. at 154. Furthermore, even if the trial court erred, habeas relief is unavailable unless the error had a "substantial and injurious effect or influence in determining the jury's verdict." <u>Brecht</u>, 507 U.S. at 627.

At trial, the prosecution introduced the letters and phone calls between Petitioner and his alleged co-conspirators (Danyell, Crystal, and Damon Folks) pursuant to the hearsay rule. Petitioner asserts the trial court erred in failing to instruct the jury using CALJIC 6.24, which states that before considering the hearsay statements of a co-conspirator, the prosecution must establish the existence of the conspiracy beyond a preponderance of the evidence. Respondent maintains that the failure to give the jury that specific instruction was not prejudicial because "there is no real doubt that Petitioner, Danyell, Crystal and Demon were conspiring to smuggle drugs into prison." (Ans. at 22.)

///

///

///

07cv0002

It is clear that the application of CALJIC 6.24, concerning the admission of evidence which is dependent on the existence of preliminary facts, is governed by California Evidence code section 403(c), which clearly states that the trial court, "[m]ay, and *on request shall*, instruct the jury. . ." (Cal. Evid. Code 403(c)) (emphasis added). The California Supreme Court's determination was reasonable in concluding that the trial court did not have a duty to instruct the jury *sua sponte* under CALJIC 6.24. Moreover, the state court's determination was based entirely on state law, and the trial court's failure to give this jury instruction, assuming it was erroneous, does not rise to the level of a federal constitutional error.

Petitioner asserts, without any factual support, that the "out-of-court statements of the alleged co-conspirators, their conduct, and activities did not establish a prima facie case of a conspiracy" and thus the state trial court's failure to instruct the jury with CALJIC 6.24 constituted prejudicial error. (Pet. at 7.) The Court previously concluded that *Petitioner's* use of language in his letters and communications, coupled with Scott's arrival at the prison with drugs, constituted evidence sufficient to overcome the possibility of prejudice as a result of the alleged error (see Claim 1, supra), and this evidence is beyond the requisite measure of proof for a prima facie case. The introduction of his co-conspirator' statements without an accompanying jury instruction did not result in prejudice, and Petitioner cannot overcome the "especially heavy" burden to show that the trial court's failure to give this instruction denied him due process. Kibbe, 431 U.S. at 154. This Court's review is properly limited to a determination whether the state court's decision was contrary to, or an unreasonable application of, clearly established federal law. Petitioner has failed to make such a showing because his federal constitutional rights were not violated by the omission of this instruction, and because he suffered no "actual prejudice." Brecht, 507 U.S. at 637. This claim does not entitle Petitioner to habeas relief.

**C.** **Claim 3**

Petitioner contends that the prosecutor committed misconduct in his questioning of Officer Pear on inadmissible matters, violating Petitioner's right to a fair trial under the Fifth and Fourteenth Amendments. (Pet. at 8.) Petitioner also claims that the admission of certain

information obtained from Pear's post-arrest conversation with Danyell Scott violated his Confrontation Clause rights under the Sixth Amendment to the Constitution. (Id.)

Petitioner presented this claim to the California Supreme Court on state habeas review, and that court denied the claim without a statement of reasoning or citation to authority. (Lodgment No. 9.) Petitioner did not raise this claim in any other state court. Because there is no lower court opinion addressing the merits of this claim, the Court is required to undertake an independent review of the record, focusing "primarily on Supreme Court cases," in order to determine whether the silent denial of this claim by the California Supreme Court was contrary to, or an unreasonable application of, clearly established federal law. Lambert, 288 F.3d at 1089. However, even when undertaking an independent review of the record, the federal court "still defer[s] to the state court's ultimate decision." Pirtle, 313 F.3d at 1167.

To constitute a denial of Petitioner's right to due process, "the prosecutorial misconduct must be 'of sufficient significance to result in the denial of the defendant's right to a fair trial.'" Greer v. Miller, 483 U.S. 756, 765 (1987), quoting United States v. Bagley, 473 U.S. 667, 676 (1985). The reviewing court must determine whether the prosecutor's misconduct served to "so infect the trial with unfairness as to make the resulting conviction a denial of due process." Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974). Pursuant to constitutional rights guaranteed by the Confrontation Clause of the Sixth Amendment, the Supreme Court has held that "[t]estimonial statements of witnesses absent from trial have been admitted only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine." Crawford v. Washington, 541 U.S. 36, 59 (2004).

Petitioner alleges that even after the trial court held Scott's statements to Officer Pear were inadmissible, the prosecution elicited testimony from Pear that came directly from his post-arrest interview with Danyell Scott. Petitioner points to two instances where Officer Pear's testimony resulted from information received in his contact with Scott, including: 1) the meaning of the word "girl" as Scott understood it, and 2) the fact that Scott and Petitioner did not have children together.

///

During a conference outside the presence of the jury, and upon a motion by the defense, the trial court ruled that while Scott's comments were relevant, any probative value was outweighed by the prejudicial effect of introducing the out of court statements without the defense having a chance to cross-examine Scott. The prosecutor acknowledged the trial court's ruling, stating that Pear would not "testify as to any of Miss Scott's statements, but certainly his expert opinion, I can't see how it would not be based on her statements. I don't understand how you could separate them, but I've instructed him not to mention the statements. Certainly if Mr. Oliver [defense counsel] were to ask what do you base your opinion on, it certainly is relevant." (Lodgment No. 10 at 21.)

Respondent maintains that "because there is no real doubt as to what Petitioner arranged for Danyell to bring him in prison," the testimony offered by Petitioner did not rise to a due process violation. (Ans. at 23.) Respondent also argues that any error was harmless under Brecht because, "[a]gain, there is no real doubt that Petitioner, Danyell, Crystal, and Demon conspired to smuggle drugs into prison." (Id. at 24.)

On direct examination, Pear testified that during the course of his investigation, he learned that Scott and Petitioner did not have children together. (Lodgment No. 10 at 73.) However, Pear did not mention that he obtained the information from his contact with Ms. Scott, and the prosecutor did not elicit any information concerning Pear's interview with Scott in questioning Pear on this matter. Pear also testified that he based his opinion that the word "girl" referred to drugs on the "content of telephone calls I monitored" and "verbiage in the out-going correspondence" from Petitioner. (Id. at 67.) Pear again made no mention of Ms. Scott, and the prosecutor refrained from eliciting Ms. Scott's comments concerning her interpretation of the term "girl," and the jury therefore was never apprised of Scott's comments. Petitioner also claims, without citation or support, that Pear testified regarding Scott's interpretation of the term girl, but the Court finds no such reference in the trial record. Without factual support, Petitioner's claim fails on the merits.

On cross-examination, Pear did make a reference to Scott's statement that she and Petitioner did not have children together, but only in response to a question by *defense* counsel.

1  Defense counsel moved to strike Pear's response, and the trial court struck the portion of

2  Pear's answer that concerned Scott's statements from the post-arrest interview. (Lodgment No.

3  10 at 185.)

4      As the prosecution did not elicit the contested information, it cannot constitute

5  prosecutorial misconduct.  Petitioner fails to demonstrate that the prosecutor's actions and

6  questions in the examination of Officer Pear on these two subjects "so infect[ed] the trial with

7  unfairness as to make the resulting conviction a denial of due process."  Donnelly, 416 U.S.

8  at 643.  Moreover, the prosecutor's actions do not implicate the Confrontation Clause, as the

9  only reference to Scott's out of court statements were stricken by the trial court at defense

10  counsel's request, and therefore the jury did not consider any such statement in their

11  deliberations.

12      Petitioner fails to show that the alleged errors had a "substantial or injurious effect or

13  influence in determining the jury's verdict."  Brecht, 507 U.S. at 631 n.7.  Therefore,

14  Petitioner's claim fails on the merits.  The state court's denial of this claim was neither

15  contrary to nor an unreasonable application of clearly established federal law.  Williams, 529

16  U.S. at 412-13.

17      **D.    Claim 4**

18      Petitioner alleges that counsel's failure to move for a mistrial based on prosecutorial

19  misconduct by the questioning of Officer Pear on inadmissible matters, denied him the

20  effective assistance of counsel under the Sixth and Fourteenth Amendments.  (Pet. at 9.)

21      Petitioner presented this claim to the California Supreme Court on state habeas review,

22  which denied the claim on the merits without citation to authority or a statement of reasoning.

23  (Lodgment No. 9.)  Petitioner did not raise this claim on any other state appeal.  As stated

24  above, because there is no lower court opinion addressing the merits of this claim, this Court

25  is required to undertake an independent review of the record in order to determine whether the

26  silent denial of this claim by the California Supreme Court was contrary to, or an unreasonable

27  application of, clearly established federal law.  Lambert, 288 F.3d at 1089.  The Court will still

28  give deference to the ultimate decision of the state supreme court.  See Pirtle, 313 F.3d at 1167.

To prevail on a claim alleging ineffective assistance of counsel, a petitioner must demonstrate (1) that counsel "made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment," and (2) that "the deficient performance prejudiced the defense." Campbell v. Wood, 18 F.3d 662, 673 (9th Cir. 1995) (quoting Strickland v. Washington, 466 U.S. 668, 687 (1984)).

To establish deficient performance, the petitioner must demonstrate that the representation he received "fell below an objective standard of reasonableness." Strickland, 466 U.S. at 688. Moreover, due to the difficulties inherent in evaluating the contested behavior from counsel's perspective at the time, there exists a strong presumption that counsel's conduct "falls within the wide range of reasonable professional assistance." Id. at 689. Thus, a petitioner must overcome the presumption that the challenged action might be considered sound trial strategy. Id. at 689.

To establish prejudice, the petitioner must demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id.

Petitioner fails to demonstrate that trial counsel's performance was deficient for failing to move for a mistrial due to prosecutorial misconduct. As stated above in the discussion of Claim 3, Petitioner has failed to substantiate his allegations of prosecutorial misconduct, as the record clearly indicates that the prosecutor did not introduce any out of court statements by Scott through the examination of Officer Pear at trial. The only mention of statements made by Scott were elicited by defense counsel during Pear's cross-examination, and upon counsel's request, the trial court struck the portion of Pear's answer that referred to the post-arrest interview of Scott. Because the prosecutorial misconduct alleged in Claim 3 did not amount to a due process violation and does not merit habeas relief, there are no grounds for a finding that trial counsel was ineffective for failing to move for a mistrial due to prosecutorial misconduct. See Boag v. Raines, 769 F.2d 1341, 1344 (9th Cir. 1985); Baumann v. United States, 692 F.2d 565, 572 (9th Cir. 1982).

1     The record supports the state court's adjudication of this claim on the merits, which was

2     neither contrary to, nor an unreasonable application of, clearly established federal law.

3     Petitioner does not merit habeas relief on Claim 4.

4          **E.    Claim 5**

5          Petitioner alleges that he was denied the effective assistance of trial counsel due to

6     counsel's repeated failure to object to Officer Pear's testimony on the meaning of the word

7     "girl" in Petitioner's phone calls and letters, violating his rights under the Sixth and Fourteenth

8     Amendments to the United States Constitution.  (Pet. at 10.)  Respondent asserts the state

9     court's rejection of this claim on appeal was not an unreasonable application of Strickland.

10    (Ans. at 25.)

11         On state habeas review, the California Supreme Court denied this claim on the merits

12    without a statement of reasoning or citation of authority.  (Lodgment No. 9.)  Petitioner did not

13    raise this claim in the Kings County Superior Court or the Court of Appeal.  Because there is

14    no lower court opinion addressing the merits of this claim, the Court is required to undertake

15    an independent review of the record in order to determine whether the silent denial of this

16    claim by the California Supreme Court was contrary to, or an unreasonable application of,

17    clearly established federal law.  Lambert, 288 F.3d at 1089.  The Court will give deference to

18    the ultimate decision of the state supreme court.  See Pirtle, 313 F.3d at 1167.

19         To prevail on a claim of ineffective assistance of counsel Petitioner must not only

20    demonstrate that trial counsel's performance was deficient, but that Petitioner suffered

21    prejudice as a result.  See Strickland, 466 U.S. at 688-89.  As previously stated, in evaluating

22    counsel's performance, the Court must indulge a strong presumption that trial counsel's

23    conduct "falls withing the wide range of reasonable professional assistance."  Id. at 689.

24         Petitioner asserts that trial counsel "repeatedly failed to object" to Officer Pear's

25    testimony, even after the trial court advised the parties, outside the purview of the jury, that

26    Officer Pear could not testify as an expert on what Petitioner meant in using certain words.

27    (Pet. at 10.)  However, the Court's examination of the trial proceedings show that defense

28    counsel did not, as Petitioner claims, merely sit idly by during the entirety of Officer Pear's

testimony. While counsel did not initially object to certain responses by Officer Pear on direct examination, such as Pear's interpretation of the meaning of "that" and "my girl" in recorded conversations, and the meaning of several other terms in Petitioner's letters, trial counsel did object to, and the trial court sustained, several later lines of questioning during Pear's direct examination when Pear again offered his opinions on the meaning of words such as "white" or "girl" in Petitioner's letters and phone calls. (See Lodgment No. 11 at 119, 123-24.) The instances early in direct examination when counsel failed to object to Officer Pear's conclusions on the meanings of certain terms in the phone calls and letters did not, on their own, result in a violation Petitioner's federal constitutional right to effective counsel. Moreover, even if this Court were to conclude trial counsel's performance was constitutionally deficient in failing to object to Officer Pear's opinions on the meaning of certain words in Petitioner's phone calls and letters, Petitioner cannot demonstrate prejudice.

The prosecution in this case presented ample evidence of the conspiracy to possess drugs in prison, apart from the testimony of Officer Pear. Petitioner sent numerous letters to Scott and others exhorting her to bring him something on her visit to him in prison, and urging Damon and Crystal to ensure that she brought him what he wanted. Petitioner also sent Scott a letter in which he repeatedly requested Scott make sure her prison visit was a "contact visit," and if it was not, to refrain from making the planned visit. Petitioner's phone calls also asked that Scott bring him "that" or "girl" on her next visit. While Petitioner maintained that he was referring to his daughter, Savannah, Scott arrived at Corcoran to visit with Petitioner alone, with cocaine secreted on her person. The plain meaning of Petitioner's repeated request, and Scott's actions in response, was obvious. Moreover, Petitioner, claiming ignorance of Scott's visit that day and denying that he made any request to smuggle drugs into the prison, sent Scott a letter four months after the charges were filed, advising her that his attorney would contact her. In this letter, Petitioner stated that, "in Vegas, girl is known to be called money because girls make more money in Vegas," and noted to Scott that, "You don't know nothing about no drugs." Again, the import of these events are in need of no interpretation.

///

The evidence against Petitioner, including his own letters and phone calls requesting Scott bring him "girl" in her next visit, coupled with Scott's arrival at the prison with drugs on her person, and Petitioner's subsequent letter advising her of the "true" meaning of the word "girl," was certainly sufficient to over come any prospect of prejudice resulting from defense counsel's failure to object to certain portions of Officer Pear's testimony. The Court is not persuaded that there is any "reasonable probability" that, but for counsel's failure to object to Officer Pear's testimony on the meaning of the word "girl," among other terms used in the letters and phone calls, "the result of the proceeding would have been different." <u>Strickland</u>, 466 U.S. at 694.

Accordingly, the state court's denial of the claim on state habeas review was not contrary to, nor an unreasonable application of, <u>Strickland</u>. Petitioner is not entitled to habeas relief on this claim.

### F. Claim 6

Petitioner claims that trial counsel rendered ineffective assistance in failing to use peremptory challenges to exclude prospective jurors who were acquainted with or related to correctional officers at the prison where Petitioner was incarcerated and which was the scene of Petitioner's charged crime, in violation of his rights under the Sixth and Fourteenth Amendments to the United States Constitution. (Pet. at 11.)

On state habeas review, the California Supreme Court denied this claim without comment or citation, and the Court must therefore "look through" that silent denial to the last reasoned opinion. <u>See</u> <u>Ylst</u>, 501 U.S. at 803. This claim was previously raised as Claim 4 of a habeas petition filed in Kings County Superior Court. (Lodgment No. 5 at 6.) The Kings County Superior Court denied Petitioner's claim without prejudice, stating, "Petitioner claims that the jury panel and selection in his case was flawed, however Petitioner has provided the Court with no information supporting his claim and only offers his opinion and conclusion that such deprivation took place." (Lodgment No. 7.)

The Sixth Amendment "guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors." <u>Irvin v. Dowd</u>, 366 U.S. 717, 722 (1961); <u>Green v. White</u>, 232

F.3d 671, 676 (9th Cir. 2000). Establishing prejudice under <u>Strickland</u> in the realm of jury selection "requires a showing that, as a result of trial counsel's failure to exercise peremptory challenges, the jury panel contained at least one juror who was biased." <u>Davis</u>, 384 F.3d at 643; <u>United States v. Quintero-Barraza</u>, 78 F.3d 1344, 1349 (9th Cir. 1995). The Court's analysis of this claim is therefore limited to the individuals who actually sat as members of the jury on Petitioner's case.

Petitioner mentions several jurors who were related to or acquainted with correctional officers, and the Court's own examination of the record substantiates his contention. Prospective juror number 266 sat on the jury as juror number 3, and stated during voir dire examination that his wife worked in corrections at Pleasant Valley in Coalinga. (Lodgment No. 13 at 32.) After establishing that this individual's wife was actually employed as a correctional officer, the trial court then asked the prospective juror, "Do you think you could be a fair juror on this case?" to which the he replied, "Yes, your Honor." (<u>Id.</u> at 47.)

Prospective juror number 161 also sat on the jury in Petitioner's case as juror number 2. During voir dire, the prospective juror stated that his wife worked in "corrections at the boot camp here in Hanford," but was never asked whether she was actually a correctional officer, rather than employed in some other capacity at that institution. (<u>Id.</u> at 98.) In response to the Court's inquiry about whether he could be a fair juror in the case, he replied, "Yes, your honor." (<u>Id.</u> at 99.)[1] The trial court found no indication that any of these jurors were biased against Petitioner or unsuitable to sit as jurors due to their personal relationships or associations. Petitioner's conclusory assertion that these individuals were biased against Petitioner simply due to their personal relationships with individuals employed by the Department of Corrections is wholly unpersuasive.

---

[1] Two other prospective jurors sat on the jury after voir dire examination touched on their close associations with individuals employed by the Department of Corrections, though not as correctional officers. Prospective juror number 292 sat on the jury as juror number 7, and during voir dire stated generally that she had close friends who worked for corrections. (<u>Id.</u> at 34.) When queried by the trial court she stated she could be a fair juror on this case. (<u>Id.</u> at 52.) Prospective juror number 002 also sat on the jury, as juror number 10. During voir dire, she stated that her husband was an office assistant employed by the Department of Corrections. When asked if she could be a fair juror on this case, she replied, "Yes, sir." (<u>Id.</u> at 101.)

Petitioner fails to present the Court with any actual evidence that any member of the jury in his case "had such fixed opinions that they could not judge impartially the guilt of the defendant." Patton v. Yount, 467 U.S. 1025, 1035 (1984). Moreover, Petitioner fails to demonstrate that trial counsel acted unreasonably or deficiently by allowing these individuals to remain on the jury. In reviewing counsel's decisions, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonably professional assistance." Strickland, 466 U.S. at 689. This deferential view applies to jury selection. Trial counsel may have had a reasonable and tactical rationale for deciding not to exercise a peremptory challenge on these jurors, including concerns regarding which prospective jurors may have replaced any challenged jurors in the panel. See People v. Kipp, 18 Cal. 4th 349, 367-68 (1998).

The state court's adjudication of this claim on state habeas review was not contrary to, nor an unreasonable application of, clearly established federal law. Therefore, Petitioner is not entitled to habeas relief on this claim.

**G.     Claim 7**

Petitioner contends that trial counsel was ineffective in failing to investigate the Kings County jury selection procedure and provide statistical evidence in support of the defense's challenge to the venire for alleged under-representation of African-Americans in the jury venire, in violation of his rights under the Sixth and Fourteenth Amendments to the United States Constitution. (Pet. at 12.)

This claim was raised as Claim 2 of a habeas petition filed in Kings County Superior Court. (Lodgment No. 5 at 4.) The court denied the habeas petition without prejudice on December 13, 2005, without comment on this claim. (Lodgment No. 7.) Petitioner did not raise this claim before the Court of Appeal. Petitioner raised the claim in his habeas petition before the California Supreme Court, which was denied on the merits without comment or citation. (Lodgment No. 9.) As stated previously, because there is no lower court opinion addressing the merits of this claim, the Court is required to undertake an independent review of the record in order to determine whether the silent denial of this claim by the California

Supreme Court was contrary to, or an unreasonable application of, clearly established federal law.  Lambert, 288 F.3d at 1089.  The Court will give deference to the ultimate decision of the state supreme court.  See Pirtle, 313 F.3d at 1167.

Under the Sixth Amendment to the United States Constitution, a criminal defendant has the right to a jury trial with an impartial jury selected from a representative cross-section of the community.  Taylor v. Louisiana, 419 U.S. 522 (1975).  There exists a well-established three-part test to determine whether there has been a violation of the constitutional guarantee to a jury comprised of a fair cross-section of the community.  The United States Supreme Court has held:

> In order to establish a prima facie violation of the fair-cross section requirement, the defendant must show (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

Duren v. Missouri, 439 U.S. 357, 364 (1979).

If a defendant is able to make a prima facie showing under Duren, the burden will shift to the state to justify the infringement by a "demonstration that attainment of a fair cross section is incompatible with a significant state interest."  Thomas v. Borg, 159 F.3d 1147, 1150 (9th Cir. 1998), citing Duren, 439 U.S. at 367-68.

The Ninth Circuit has held that African-Americans do constitute a "distinctive group" for the purposes of Duren, and Petitioner therefore satisfies the first prong.  See Randolph v. People of the State of California, 380 F.3d 1133, 1139-40 (9th Cir. 2004).  However, Petitioner provides no evidence to attempt to satisfy either the second or third prongs under Duren.  The second prong requires Petitioner to show that the representation of African-Americans in the Kings County jury venire was not fair or proportionate in relation to the number of African-Americans in the general population of Kings County.  Proof of such a disparity is typically offered through the presentation of statistical data, and Petitioner fails to present any support for his allegations.  Nor does he offer any facts about the jury selection process in Kings County or any proof of discrimination against African-Americans in the jury system.

1    Moreover, even if Petitioner provided sufficient data to satisfy the second <u>Duren</u> prong,

2  his claim fails on the third prong.  <u>See</u> <u>Randolph</u>, 380 F.3d at 1141.  Petitioner's counsel was

3  not ineffective for failing to raise the under-representation issue at trial because the record

4  contains no evidence of systemic exclusion of African-American jurors.  <u>See</u> <u>Shah v. United</u>

5  <u>States</u>, 878 F.2d 1156, 1162 (9th Cir. 1989) ("The failure to raise a meritless legal argument

6  does not constitute ineffective assistance of counsel.").

7    Petitioner fails to demonstrate that the state court's rejection of this claim on habeas

8  review was contrary to, or an unreasonable application of, <u>Strickland</u>.  Thus, Petitioner is not

9  entitled to habeas relief on this claim.

10    **H.    Claim 8**

11    Petitioner alleges that trial counsel's failure to move for a change of venue constituted

12  ineffective assistance of counsel, in violation of his rights under the Sixth and Fourteenth

13  Amendments to the United States Constitution.  (Pet. at 13.)

14    Petitioner raised this claim in a habeas petition filed in Kings County Superior Court.

15  (Lodgment No. 5 at 6.)  The petition was denied without prejudice on December 13, 2005,

16  without a statement of reasoning with respect to the instant claim.  (Lodgment No. 7.)

17  Petitioner did not raise the claim before the Court of Appeal.  Petitioner again raised the claim

18  in his habeas petition before the California Supreme Court, which was denied on the merits

19  without comment or citation.  (Lodgment No. 9.)  As stated previously, because there is no

20  lower court opinion addressing the merits of the claim, the Court is required to undertake an

21  independent review of the record in order to determine whether the silent denial of this claim

22  by the California Supreme Court was contrary to, or an unreasonable application of, clearly

23  established federal law.  <u>Lambert</u>, 288 F.3d at 1089.  The Court will give deference to the

24  ultimate decision of the state supreme court.  <u>See</u> <u>Pirtle</u>, 313 F.3d at 1167.

25    To establish that his trial counsel was ineffective in failing to pursue the change of

26  venue motion, Petitioner must demonstrate both that: (1) trial counsel's performance was

27  deficient, and (2) the deficient performance resulted in prejudice.  <u>Strickland</u>, 466 U.S. at 687.

28  Petitioner must also overcome the strong presumption that counsel's representation "falls

within the wide range of reasonable professional assistance." <u>Id.</u> at 689.

It is well-established that a criminal defendant is entitled to be tried by "a panel of impartial, 'indifferent' jurors." <u>Irvin</u>, 366 U.S. at 722. However, Petitioner fails to establish that counsel's performance fell below an objective standard of reasonableness in failing to move for a change of venue. Petitioner asserts only that a change of venue was necessary because "of the size of the County which contains three major prisons made it impossible to gain a fair trial and fair jury because most people in Kings County were related to, or acquainted with the correctional officers who worked at the prisons [sic] where petitioner was charged with a crime." (Pet. at 10.)

The record does not reflect "an atmosphere in the community or the courtroom" that denied Petitioner his right to a fair and impartial jury in Kings County. <u>Murphy v. Florida</u>, 421 U.S. 794, 799 (1975). The Court's review of voir dire reveals that no member of the jury was related to a correctional officer employed at the prison (Corcoran State Prison) where Petitioner's charged crime occurred. The two individuals who were related to correctional officers affirmed to the trial court that they could be fair and impartial jurors on Petitioner's case.

Moreover, Petitioner fails to demonstrate any actual prejudice. Petitioner has "produced no evidence or argument suggesting that his counsel's failure to defeat venue . . . had any bearing on the fairness of his trial or was otherwise prejudicial or outcome-determinative." <u>United States v. Palomba</u>, 31 F.3d 1456, 1461 (9th Cir. 1994). The mere existence of correctional officers or their relatives in the jury venire, without a credible showing of any bias, is insufficient to demonstrate prejudice. <u>See</u> <u>Gallego v. McDaniel</u>, 124 F.3d 1065, 1070 (9th Cir. 1997), quoting <u>United States v. Sherwood</u>, 98 F.3d 402, 410 (9th Cir. 1996) ("To establish actual prejudice, the defendant must demonstrate that the jurors exhibited actual partiality or hostility that could not be laid aside."). Because the Court cannot conclude that the state court's rejection of this claim on habeas review was contrary to, or an unreasonable application of, clearly established federal law, Petitioner is not entitled to relief on this claim. ///

07cv0002

# VI. CONCLUSION AND ORDER

For the reasons stated above, the Petition for a Writ of Habeas Corpus is **DENIED** as to all claims.

**IT IS SO ORDERED**.

DATED:  April 15, 2009

_____
Hon. Roger T. Benitez
United States District Judge